UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUCENT TRANS ELECTRONICS, LTD.,<br><br>        Plaintiff and Counter-<br>        Defendant,<br><br>      v.<br><br>XENTRIS WIRELESS, LLC,<br><br>        Defendant and Counter-<br>        Plaintiff. | No. 23 CV 15992<br><br>Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Plaintiff and counter-defendant Lucent Trans Electronics and defendant and counter-plaintiff Xentris Wireless had a supplier–customer relationship governed by an agreement. In 2021, Xentris placed six purchase orders for cell phone charging equipment from Lucent. In 2022, Xentris asked Lucent to stop production of the products. Lucent stopped production, but sought payment for the parts it had already acquired to manufacture the ordered products. Xentris did not pay, and Lucent sued Xentris for breach of contract. Xentris filed a counterclaim, alleging that Lucent had breached the purchase orders by failing to timely deliver quality product. Both parties move for summary judgment on their own claims. For the reasons discussed below, Lucent's motion is granted in part and denied in part, and Xentris's is denied.

## I.   Legal Standard

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views "the facts and draws reasonable inference in the light most favorable to the non-moving party." *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). "When both parties move for summary judgment, we take the motions one at a time, viewing the facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was made." *Ellison v. United States Postal Serv.*, 84 F.4th 750, 755 (7th Cir. 2023).

## II.   Facts

Plaintiff and counter-defendant Lucent Trans Electronics is a Taiwanese company based in Taiwan. [57] ¶ 1; [59] ¶ 1.[1] Defendant and counter-plaintiff Xentris Wireless has its principal place of business in Addison, Illinois. [57] ¶ 2; [59] ¶ 2.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [57], [59], [67], and [68], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions.

Xentris distributes cell phone accessories, including chargers and related devices, throughout North America, including to its retail partner Verizon Wireless. [57] ¶ 4; [59] ¶¶ 6, 8. Xentris's business relationship with Verizon includes distributing private label products for resale within Verizon's deal network. [57] ¶ 4; [59] ¶ 9. Lucent manufactures cell phone accessories, including chargers. [57] ¶ 3; [59] ¶ 7.

Xentris has been Lucent's customer since December 2009. [57] ¶ 5. In 2014, Xentris and Lucent entered into a supply agreement. [57] ¶ 6; [59] ¶ 10; [68] ¶¶ 67–68. In each of its purchase orders, Xentris provided a due date, which Lucent used for reference. [57] ¶ 10; [67] ¶ 2. This due date was not the outside date on which ordered parts must be delivered to Xentris, and the actual delivery date was determined later through discussions between Xentris and Lucent. [67] ¶¶ 1–2.[2] When Lucent received the purchase orders from Xentris, it would enter the details of the order into a shipping schedule spreadsheet, which Xentris called the Master Schedule. [57] ¶ 11; [67] ¶ 3.

The spreadsheet compiled all purchase order information, including the purchase order date, purchase order number, Xentris part number, part description,

---

[2] Xentris both admitted that the date on the purchase order was *not* the outside delivery date, [67] ¶ 1, and asserted that the due date was the outside date that the parts must be delivered to Xentris's facilities in Illinois. [59] ¶ 12. Xentris's assertion is not supported by the evidence. Section 5.1 of the contract states that the due date is the delivery date stated on a purchase order "unless otherwise noted on Supplier's written acceptance." [51-3] at 3 (§ 5.1). Xentris also admits that after Lucent received estimated arrival dates of the raw materials needed to manufacture the parts for Xentris, Lucent and Xentris would have discussions to reach an agreement on a delivery date for the final products. [57] ¶ 16. Lucent points out emails between Xentris and Lucent showing the parties discussing shipment dates, including Xentris approving shipments to be "released" after the inspection process. *See, e.g.*, [51-14]; [51-18]; [51-19]. Despite Lucent's delays in shipping several orders, Xentris approved shipments and accepted products. [51-14]; [67] at 7.

quantity, shipment method, freight forwarder/courier, tracking number, Xentris required date, supplier promise ship date, estimated Xentris receipt date, and comments. [57] ¶ 12; [67] ¶ 4. Once Lucent had filled out the information, it would email Xentris a copy of the spreadsheet. [57] ¶ 13. In the email, Lucent would sometimes include updated information on any shipping schedule changes. [57] ¶ 14. Sometimes, Xentris would email comments on or request changes to the shipping schedule. [57] ¶ 15. After Lucent confirmed the estimated arrival dates of the raw materials needed to produce the products Xentris ordered, Lucent and Xentris would engage in discussions to reach an agreement on the delivery date for each product. [57] ¶ 16, [67] ¶ 5. Before shipping the products to Xentris, Lucent would provide Xentris a quality control inspection report. [57] ¶ 17. Once Xentris completed the inspection and approved the shipment, Lucent shipped the products to Xentris. [57] ¶ 18. Lucent would then enter the "actual ship date" and "estimated Xentris receipt date" in the spreadsheet to reflect the completion of the delivery. [57] ¶ 19; [67] ¶ 5.

In 2021, Xentris placed six orders—purchase orders 45464, 45502, 45667, 45804, 45805, and 45806—with Lucent to fulfill purchase requirements for Verizon. [57] ¶ 7; [59] ¶ 11. In emails, Xentris said that it was issuing the purchase orders to "drive [Lucent to] purchas[e]" manufacturing materials. [57] ¶ 66. In February 2022, Xentris modified purchase orders 45804, 45805, and 45464. [57] ¶¶ 8–9.

Purchase order 45464, revised on July 12, 2021, includes a line item for the Verizon 40 W PPS USB-A and USB-C Vehicle Charger – Black (576P). [57] ¶ 56.[3] For

---

[3] Xentris objects to this fact, but its response does not contradict the asserted fact.

this product, the components labeled 001 to 0062 in the master file comprise the components and raw materials that Lucent procured and prepared for production. [57] ¶ 57.[4] Lucent ordered a total of 14,563 units of Component 001 over two orders in December 2021 and January 2022. [57] ¶ 58. The third-party supplier of this component delivered the components in two deliveries in January and April 2022, and Lucent confirmed receipt of the components on both delivery dates. [57] ¶¶ 59–60. Lucent issued statements to Xentris in February and May 2022, and issued a special invoice for value-added tax in July 2022. [57] ¶¶ 61–62.

On June 18, 2022, Lucent received an email from Xentris's Vice President of Product Management and General Manager in Asia on behalf of Xentris's CEO, asking Lucent to delay production for the six purchase orders. [57] ¶¶ 20–22. She explained that "Xentris customers recently informed us that traffic in their stores is temporarily down and subsequently sales of our products is also down." [57] ¶ 23. Sarah Shieh, the Lucent sales manager, responded that certain inventory and materials orders had already been placed and could not be canceled. [57] ¶ 24. Shieh said that Lucent tried to cancel orders for integrated circuit chips, but the supplier of those chips told Lucent the order was non-cancelable. [57] ¶ 24. Shieh also sent Xentris screenshots of the emails from the supplier denying the request for cancelation. [57] ¶ 25.

A few weeks later, Shieh wrote an email to Xentris's CEO, dictated by the Lucent CEO and sent from his email, explaining to Xentris that Lucent had already

---

[4] Xentris objects to this fact, but its support for the response does not support its objection.

paid for certain inventory and material costs in June 2022 related to the orders Xentris was requesting to delay. [57] ¶¶ 26–27.[5] The inventory and costs were based on Xentris's instructions in its 2021 order to "order long lead time components based on Xentris forecast and official" purchase orders. [57] ¶ 28. Lucent expressed its concerns with the requested production delays and urged Xentris to "resume production and take shipments in September, October and November as below plan." [57] ¶ 29.[6] Xentris replied that it could not honor its purchase orders because Verizon was experiencing a sales slowdown and requesting fewer Xentris products. [57] ¶ 30.

For the next few months, Lucent and Xentris exchanged approximately fourteen emails about the outstanding components and materials that Lucent could not repurpose or otherwise use after Xentris asked Lucent to stop production on the open purchase orders. [57] ¶ 31.[7] In these emails, Xentris asked questions about the components and materials and their associated costs, and Lucent provided the requested information in both the bodies of the emails and in attached spreadsheets,

---

[5] Lucent says that its CEO wrote the emails; Xentris argues that Lucent's CEO does not speak English and did not directly communicate with Xentris but went through Shieh. [57] ¶ 26–27; [68] ¶ 88. Xentris does not dispute the content of the email.

[6] Again, Xentris disputes that the Lucent CEO wrote the email but does not dispute the content of the email.

[7] Xentris disputes this fact and argues that it's possible that although the emails were sent and received from sarah@lucenttrans.com.tw, Shieh may not have authored or received the emails. This does not contradict the asserted fact. Xentris continues to make this same objection based on authorship throughout its responses to Lucent's statements of undisputed material fact. The authorship of the individual emails is not material; Xentris does not argue that these emails did not come from someone within Lucent. It is not clear why it matters whether Shieh or Lucent's CEO wrote the emails, if they are both representatives of Lucent and the admissions are attributable to Lucent. Because the authorship of the emails is not relevant to the dispute, I will only address Xentris's objections to the content of emails.

including detailed breakdowns of the raw materials and their costs. [57] ¶¶ 32–33. In September 2022, Xentris told Lucent that "expected sales will continue to be low and will last at least for the next several months. [Xentris] will not be able to resume production soon." [57] ¶ 34. Xentris expressed a willingness to "work collectively to put the materials in use" and "allowed [Lucent's] team to sell the products to [Lucent's] other customers." [57] ¶ 35. Xentris also told Lucent that it would compensate Lucent for a reasonable amount. [57] ¶ 36.

Lucent responded that the semi-finished goods and components are exclusive materials for Xentris, and other models would not be able to use them. [57] ¶ 37. Lucent also said that reselling the components in markets outside the United States was difficult because the products only have U.S. certifications and use a U.S. AC prong. [57] ¶ 38. However, Lucent said it would try its best to sell both the material and finished product. [57] ¶ 38.

In March 2023, Lucent emailed Xentris to set up a payment plan of $30,000 to $50,000 a week to clear the material costs for the purchase orders that Xentris had canceled. [57] ¶ 39. Xentris responded that the U.S. market had been difficult, and requested an itemized list of materials and costs to "have a clear understanding of how much is ow[ed] and for what." [57] ¶¶ 40–41. Lucent responded with the requested itemized list of materials and costs. [57] ¶ 42. About a month later, Lucent followed up with Xentris. [57] ¶ 43. Xentris responded that it was "working with Verizon on a daily basis trying to figure out a path to continue with the production of these skus" and would "see if there is a plan we can work towards." [57] ¶ 44.

A week later, Lucent again emailed Xentris to ask if Xentris could make a $30,000 weekly payment. [57] ¶ 45. A month later, Lucent followed up with Xentris, saying that Lucent gets messages daily from suppliers asking how to handle material inventory. [57] ¶ 46. Lucent again asked for weekly payments or to establish some payment plan. [57] ¶ 47. Xentris responded, "We work with customer every day to monitor inventory status and sales volume. All we hope is that we can start production sooner." [57] ¶ 48. Xentris again requested a breakdown of the material costs. [57] ¶ 49. Two months later, Xentris requested a current statement from Lucent. [57] ¶ 50. Lucent provided a detailed breakdown of the current statement, including two spreadsheets of itemized expenses that included shipped goods totaling $31,970.02 and components and raw material costs totaling $2,541,149. [57] ¶¶ 51–52.

The shipping schedule spreadsheet's "comments (delays, reasons for)" column includes the components for which Xentris had requested Lucent stop production. [53-2]. Lucent claims it has received and paid for nearly all the components and materials required to fulfill Xentris's purchase orders. [57] ¶¶ 54–55. Xentris disputes that Lucent procured and paid for the various components. [57] ¶¶ 54–55.[8]

For each component and material listed in the shipping schedule spreadsheet, Lucent claims it has documents to prove its procurement, which reflect the procurement process for each component listed in the spreadsheet. [57] ¶ 63.[9] Xentris

---

[8] The two spreadsheets Lucent cites do not clearly show that the components were received and paid for. [53-2], [53-6].

[9] Lucent does not cite directly to these underlying documents.

8

again disputes whether Lucent procured and paid for the components. [57] ¶ 63.[10]
For example, one of the components necessary for the Xentris products was an
integrated circuit chip. [68] ¶ 79. These chips were difficult to obtain and had an
uncertain delivery date. [68] ¶ 81. One supplier of the chips, Microchip JHQ, never
delivered any chips to Lucent. [68] ¶ 83. The other supplier, Cypress, had delivered
chips to Lucent but the deliveries were delayed. [68] ¶ 82.

Lucent claims it has incurred a loss of $2,541,149: $892,987 for the
components and raw materials for vehicle and travel chargers; $1,051,620 for
standard lead time materials for wireless chargers; $472,644 for long lead time
materials for wireless chargers; and $123,898 for semi-finished product processing
fees. [57] ¶ 64.[11]

Xentris claims that Lucent's products had quality defects and were not timely
delivered. [68] ¶¶ 73, 76, 84. Lucent claims that the defective products cited by
Xentris were related to different purchase orders than the ones at issue in this case.
[67] ¶ 6.[12] Lucent also says that Xentris had accepted all of the allegedly defective
products, which were in orders fulfilled before the orders at issue here, and that

---

[10] Xentris's support for its objection only supports that the integrated circuit chips may not
have been procured and does not address other components Lucent claims it acquired.

[11] Lucent's cited documents do not show that these parts were actually procured and paid for,
only that Lucent claims they had been. However, in its objection, Xentris points to depositions
that support Lucent's claims—depositions where Shieh testified that Lucent spent $2.5
million on raw materials, and the Lucent CEO testified that the raw materials were being
held in Lucent's factories in Tawain and China. [68] ¶¶ 90–91.

[12] Xentris disputes this, but its objection is not responsive to the asserted fact.

Xentris continued to place orders after these products had been delivered. [67] ¶ 7.[13] For at least three products in three of the orders at issue, the products passed electrical/functional testing performed by Xentris. [61-4] at 2. However, Xentris staff also pointed out two units with cosmetic issues. [61-4].[14] Despite the cosmetic issues, Xentris accepted the products. [67] ¶ 8.

On the other hand, Lucent admits that it received a letter from Xentris's counsel—it is unclear from the record exactly when—that indicated that Xentris wished to end the business relationship because Lucent failed to meet production schedules and had significant quality defects in product manufacturing. [68] ¶ 87.

Xentris claims that Lucent's failure to timely deliver quality products with respect to the purchase orders at issue in this litigation resulted in Xentris having to pay more than $3,000,000 in air freight charges to ship the delayed products to meet the needs of Xentris's customers. [68] ¶ 78. Lucent disputes this, and notes that it was Xentris that requested repeated delays in production, and in doing so, did not mention the delayed production was attributable to Lucent's failure to timely deliver or any product quality issue. [51-22] at 15–16; [61-1] ¶ 12. The correspondence Lucent received from Xentris attributed the requested delays to Verizon's slow business and "little consumer spending." [51-22] at 4, 15–16; [51-23] at 2; [61-1] ¶ 11. Lucent

---

[13] Xentris disputes this and says that it had repeatedly raised quality issues with Lucent between 2018 and 2023. While this is true, it does not address whether the products in the specific shipments at issue in this litigation were defective.

[14] To the extent that Lucent attempts to extrapolate from the emails it cites to suggest that there were no quality issues with any of its products, the emails themselves do not support that conclusion. Lucent is correct that the products were functional, but Xentris is correct that there were some cosmetic issues with a few units.

disclaims any knowledge of the air freight charges. [53-1] at 60 (59:16–22); [67] ¶ 15; [61-1] ¶ 10; [70-2] ¶ 17.[15]

The supply agreement signed by the parties allows Xentris to change, including cancel, purchase orders for ten days without charge or penalty. [51-3] at 3 (§ 5.3); [68] ¶ 86. If there is a delivery delay of more than five business days after the "committed delivery date, as defined on Supplier's acceptance, of all or any portion of Products listed on the Purchase Order, Xentris may cancel without charge that portion of the Products which have been so delayed." [51-3] at 3 (§ 5.3); [68] ¶ 86. In that case, "Xentris shall not be liable for any expenses incurred by Supplier for canceled, undelivered Products that are or will be delayed." [51-3] at 3 (§ 5.3); [68] ¶ 86.[16]

Lucent points to Section 17.1 of the agreement, which requires a three-step process for either party to terminate a purchase order:

> Either Xentris or Supplier may terminate this Agreement or a Purchase Order upon the other party's material breach of this Agreement, provided that: (i) the non-breaching party shall first have sent written notice to the breaching

---

[15] Xentris disputes that Lucent was not aware of the freight charges based on the Lucent CEO's reliability; the credibility of a witness is a question for the jury and should not be assessed on summary judgment. *Wood v. Security Credit Servs., LLC*, 126 F.4th 1303, 1315 (7th Cir. 2025).

[16] Xentris claims the contract includes the statement "Xentris reserves the right to cancel the project at any time if quality, or schedule or both do not meet Xentris criteria." [68] ¶ 85. Lucent disputes this. The contract does not have this language. Xentris cites to an affidavit by an employee, who says the transmittal document has that language. [49-2] ¶ 10. The affidavit cites to an email from a Xentris employee sending purchase orders to Lucent, which has the following at the bottom of the email: "Xentris reserves the right to cancel the [purchase orders] at any time if Lucent team cannot keep schedule or quality outside of any factors out of your control." [49-2] at 11. This unilateral announcement by Xentris is not part of the contract, and there is no evidence that Lucent accepted such a material change to the parties' agreement.

> party describing the breach in reasonable detail and
> demanding that it be cured; (ii) the breaching party does
> not cure the breach within thirty (3) [sic] days following its
> receipt of such notice; and (iii) following the expiration of
> the thirty (30) day cure period, the non-breaching party
> sends a second written notice to the breaching party
> indicating that the non-breaching party has terminated
> this Agreement and the effective date of the termination.
> Upon any termination pursuant to this Section 15.1,
> Supplier shall fill any outstanding Purchase Orders.

Lucent claims that Xentris did not provide either the first or second notices as required by Section 17.1 of the agreement. [67] ¶¶ 11–12.[17]

Lucent sued Xentris for breach of contract and promissory estoppel, seeking damages in the amount of $2,541,149. [57] ¶ 53.

## III.   Analysis

### A.   Lucent's Motion for Summary Judgment

Lucent argues that it is entitled to summary judgment on its breach of contract claim because Xentris instructed Lucent to stop production of products in six purchase orders and did not pay for them. Lucent also argues that it is entitled to summary judgment against Xentris for promissory estoppel.[18]

---

[17] Xentris disputes this, but its cited evidence does not support its objection.

[18] I have subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2): Xentris is a citizen of New York, [28] at 2, Lucent is a citizen of a foreign state, [23], and the amount in controversy for each party's claim exceeds $75,000, exclusive of costs and interest. [1] ¶¶ 3, 23; [10] at 12, 15; *see also* [29] (noting that the citizenship of one of Xentris's members remains ambiguous, but is likely diverse from Lucent). When a federal court sits in diversity, the forum state's choice-of-law rules determine what state's law applies to the issues before it. *Paulsen v. Abbott Lab'ys*, 39 F.4th 473, 477 (7th Cir. 2022). Under Illinois choice-of-law rules, the forum state's law applies unless there is an actual conflict with another state's law shown by a party, or the parties agree that forum law does not apply. *Id.*; *see also Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 14 (2014) (a choice-of-law analysis is only required where a party shows that a difference in law will make a difference

### 1. Breach of Contract

Lucent's breach of contract claim requires (1) the existence of a valid and enforceable contract; (2) substantial performance by Lucent; (3) a breach by Xentris; and (4) resulting injury to Lucent. *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 119 F.4th 522, 525–26 (7th Cir. 2024). In interpreting the contracts between Lucent and Xentris, my "primary objective is to give effect to the intention of the parties." *Id.* at 526 (quoting *Thompson v. Gordon*, 241 Ill.2d 428, 441 (2011)). Both parties agree that the supply agreement and purchase orders are valid and enforceable contracts. In its response, Xentris only challenges that it breached and Lucent's claim for damages.

First, Xentris says that "a breach of contract claim requires an identifiable breach of a contract term," and that "[i]t is abundantly clear that Xentris did not breach the terms of the contract." [56] at 6. Lucent has identified the breach as Xentris's order to halt production of the products it had ordered and failure to pay. Xentris does not dispute that it asked Lucent to stop production of the orders. The purchase order was a contract for the sale of movable goods, which is governed by the Uniform Commercial Code, as adopted by Illinois via 810 ILCS 5/1-101 et seq. Under Section 2-507 of the UCC, a buyer must accept and pay for goods when they are tendered by the seller. 810 ILCS 5/2-507(1). Lucent agreed to manufacture parts, and Xentris had a duty to accept the goods and pay for them. Lucent puts forth evidence

---

in the outcome of the case). The parties both apply Illinois law. There is no need for an independent choice-of-law analysis.

that it began performance when Xentris asked it to stop performing. Xentris's order to stop performance was, in essence, repudiating the contract in advance of the date of delivery; this is a breach of the contract. *Tower Invs., LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1032 (1st Dist. 2007); 810 ILCS 5/2-610(b) ("When either party repudiates the contract with respect to a performance not yet due…the aggrieved party may…resort to any remedy for breach."). Lucent has shown that Xentris breached the purchase orders, and Xentris points to no facts in dispute to counter that conclusion.

Xentris instead argues that the contract included the statement "Xentris reserves the right to cancel the project at any time if quality, schedule or both do not meet Xentris criteria." [56] at 6. It also argues that there are genuine issues of material fact regarding the "substandard quality of the products Lucent provided to Xentris." [56] at 6. Lucent takes this as an argument that Xentris was entitled to breach because of the quality defects in the product. [69] at 3–5.

No contract gives Xentris the unconditional right to cancel. Neither the supply agreement nor any of the purchase orders themselves contain this language. The only portion of the record that includes this language is the body of an email from Xentris's supply chain manager to Lucent with a purchase order attached, which reads: "Xentris reserves the right to cancel the POs at any time if Lucent team cannot keep schedule or quality outside of any factors out of your control." [49-2] at 11. Illinois contract law confines contract interpretation to the "four corners" of the contract, unless there is ambiguity in the contract. *Clanton v. Oakbrook Healthcare Ctr., Ltd.*,

14

2023 IL 129067, ¶ 33 (2023). Neither party argues that the purchase orders or supply agreement are ambiguous regarding Xentris's right to cancel. This reservation of rights is not a term within the four corners of either the purchase order or the supply agreement and is thus not a term of the contract.

Even if it were a term of the contract, the supply agreement ultimately governs the terms of any other agreement between the parties; if there are any inconsistencies between the supply agreement and "any P.O.s, invoices or forms used under this Agreement…the terms and conditions of this Agreement shall prevail." [51-3] at 7 (§ 22.6). In the supply agreement, Xentris may only cancel a purchase order "upon the other party's material breach" after first sending "written notice…describing the breach in reasonable detail and demanding that it be cured," giving the breaching party thirty days to cure the breach, and finally, sending a second written notice of termination with the effective date of termination. [51-3] at 5 (§ 17.1). Xentris could cancel "at any time," as long as it followed the notice-and-cure provision in § 17.1 of the supply agreement.

There is no genuine dispute that Xentris did not comply with this provision when it ordered Lucent to stop production. Xentris never notified Lucent that Lucent had breached, nor did it allow Lucent to cure any alleged breach, before stopping production. Instead, it claimed that Xentris's customer's slowdown in sales was the reason it was halting production. [57] ¶¶ 21–23. Even if Lucent had breached by not timely delivering products or delivering poor quality products, Xentris did not have the right to unilaterally terminate the contract without giving Lucent notice and

thirty days to cure. *Canteen Corp. v. Former Foods, Inc.*, 238 Ill. App. 3d 167, 182 (1st Dist. 1992); *see also Allan Block Corp. v. Cnty. Materials Corp.*, 512 F.3d 912, 919 (7th Cir. 2008) (where there is a notice and cure provision in a contract, notice of breach is a "condition precedent…to being authorized to terminate the contract immediately without liability to the other party"). Xentris did not give Lucent notice of any breach and an opportunity to cure before stopping manufacturing of its already-ordered parts. There is no genuine dispute that Xentris breached the contract with Lucent.

Xentris also disputes that Lucent has proved it suffered damages. A plaintiff who claims a breach of contract must "establish an actual loss or measurable damages resulting from the breach in order to recover." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App. (1st) 200894, ¶ 39 (1st Dist. 2021). The plaintiff must establish a reasonable basis for the damages it seeks. *Id.* Though absolute certainty is not required, "the plaintiff must prove damages with reasonable certainty without resort to conjecture or speculation." *Id.* Damages are considered speculative only if their existence is uncertain, not if the amount is uncertain or yet to be fully determined. *In re Est. of Powell*, 2014 IL 115997, ¶ 13 (2014).

Lucent alleges that it spent $2,541,149 in direct costs for components it acquired to manufacture the cell phone chargers in the purchase orders. Xentris claims that Lucent did not acquire certain components, including for integrated circuit chips that had been delayed. *See* [57] ¶¶ 55–57. Xentris, in its response to Lucent, points to the deposition of Lucent's CEO, who could not testify to what

16

comprises the $2.5 million claim, but did say that the raw materials ordered to fulfill Xentris's purchase orders were at Lucent's factories. Xentris also refers to Lucent's sales manager's deposition, where she could not say if the materials were still in inventory, but did confirm that Lucent spent $2.5 million in raw materials. Xentris's own arguments provide support for Lucent's claim that it was injured by Xentris's breach of the purchase orders. Xentris produces no evidence to contradict that Lucent had ordered component parts to manufacture Xentris's products, incurring costs in doing so. Lucent has demonstrated there is no genuine dispute of material fact as to liability for breach of contract.

Xentris does not respond to Lucent's argument in support of the *amount* of damages Lucent seeks, only that it doubts that Lucent was damaged at all. Lucent's financial manager avers that Lucent has incurred a total loss of $2,541,149, including $892,987 for components and raw materials; $1,051,620 for standard lead time materials for wireless chargers; $472,644 for long lead time materials for wireless chargers; and $123,898 for semi-finished product processing fees. [70-3] ¶ 15. Xentris makes no argument nor points to any disputed fact to challenge this amount in damages. In the absence of any genuine dispute over Lucent's damages calculation, Lucent is entitled to damages in the amount of $2,541,149.

### 2.  *Promissory Estoppel*

Lucent also moves for summary judgment on its promissory estoppel claim. Promissory estoppel is "an alternative means of obtaining contractual relief under Illinois law." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012).

Promissory estoppel claims are not "designed to give a party…a second bite at the apple in the event that it fails to prove a breach of contract." *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (quoting *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869–70 (7th Cir. 1999)). Instead, promissory estoppel is available only where "all the other elements of a contract exist, but consideration is lacking." *Id.* "Application of promissory estoppel is proper only in the absence of an express agreement." *Matthews v. Chi. Transit Authority*, 2016 IL 117638, ¶ 92 (2016). Both parties here agree that their relationship is governed by express agreements—the supply agreement and purchase orders. Promissory estoppel does not apply, and Lucent's motion for summary judgment on its promissory estoppel claim is denied (and had Xentris moved for summary judgment, it would be entitled to judgment as a matter of law on Lucent's promissory estoppel claim).

### B. Xentris's Motion for Summary Judgment

Xentris moves for summary judgment on its claim that Lucent breached the purchase orders and supply agreement. Xentris argues that "Lucent exhibited a continued part [sic] of shipping delays and quality issues that ultimately resulted in Xentris' own customer not placing orders and a loss in business to Xentris." [50] ¶ 8. Xentris claims that Lucent's complaint shows it did not manufacture the products in accordance with the terms the supply agreement and purchase orders. [50] ¶ 9. Xentris's breach of contract claim requires (1) the existence of a valid and enforceable contract; (2) substantial performance by Xentris; (3) a breach by Lucent; and (4) resulting injury to Xentris. *Full Circle Villagebrook GP*, 119 F.4th at 525–26. Lucent

argues that there is a genuine dispute whether it breached the contract. Because Lucent has shown a genuine dispute over whether the orders were delayed, and whether any quality issues were a breach of the contract, Xentris's motion for summary judgment is denied.

### 1. Delays causing breach

Xentris argues that the outside delivery date for the products it ordered is the date on the purchase orders, and that Lucent failed to deliver the products in this case pursuant to the purchase orders, which breached the purchase orders and supply agreement. However, Lucent has put forward facts showing that the date on the purchase orders is *not* the outside delivery date. A reasonable jury could find that Lucent did not breach the supply agreement or purchase orders here.

First, the supply agreement states that the date on the purchase order is the promised delivery date "unless otherwise noted on Supplier's written acceptance." [51-3] at 3 (§ 5.1). The outside delivery date is not always the date in the purchase order, according to the supply agreement. Second, the parties' course of conduct did not enforce the due dates as outside delivery dates. Xentris admits, and the evidence shows, that the parties would email back and forth, including requests (from both parties) to change the shipping schedule and discussions to reach an agreement on a delivery date after Lucent received the raw materials necessary for manufacture. [57] ¶¶ 14–16. Under the Uniform Commercial Code, an agreement to modify a contract needs no consideration, but does need to satisfy the statute of frauds. 810 ILCS 5/2-209(1), (3). The statute of frauds requires that a sale of goods for more than $500 be

memorialized in a writing signed by the party sought to be held to that term. 810 ILCS 5/2-201(1). An email signature satisfies the signature requirement of the statue of frauds. *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295–96 (7th Cir. 2002). There is evidence that the parties continuously modified their agreements with updated delivery schedules via email, including for the purchase orders here.

It is true that Lucent's production was delayed because of the difficulty in getting integrated circuit chips. [51-22] at 6. But there is no indication that Xentris considered this a breach, and Xentris later requested a delay in production on the purchase orders that the integrated circuit chips were to be used for—evidence that Lucent had not breached by failing to timely deliver and Xentris considered the due date still open. [57] ¶ 22. There is a genuine issue of fact what the delivery date was for the six purchase orders at issue, and whether Lucent did not deliver products on time. Xentris has not proven that Lucent breached the contract by not delivering the products by the date in the purchase order as a matter of law.

### 2. *Quality issues causing breach*

Xentris also claims that Lucent breached their agreement by delivering products with quality defects. Lucent responds that any quality issues were something addressed *before* any goods were shipped to Xentris, as part of the parties' regular practice. Lucent also argues that Xentris's evidence that the goods delivered were of poor quality is for purchase orders *before* the purchase orders in this case were made. [49-2] at 30–34 (purchase order 44613, report date December 7, 2020), 35–41 (purchase order 44927, report date March 25, 2021). Lucent points out that

20

Xentris accepted the allegedly defective products in those purchase orders and continued placing purchase orders, including the six at issue here. [67] ¶ 7.

The only evidence about quality issues in products ordered in the purchase orders in this case are two emails. In the first email, a Xentris employee notified Lucent that there were some cosmetic issues on two units sent in for testing from purchase orders 45502 and 45805. [61-4] at 2. There is no evidence that Xentris rejected the rest of the units in the order; in fact, Xentris told Lucent that "[a]ll 3 lots were received in." [61-4] at 2. The second email informed Lucent that "the drop issue is now clear, so Lucent can resume production for this point." [61-5] at 2. The Xentris employee in the email asked for a plan to fix cosmetic issues in the future, but did not reject any goods as non-conforming, and instead resumed manufacturing. [61-5] at 2. It is not clear what purchase order this email chain refers to.

Once a buyer accepts goods, it must pay the contract price for those goods. 810 ILCS 5/2-607. Where a tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 810 ILCS 5/2-607(3)(a). "[E]ven if a manufacturer is aware of problems with a particular product line, the notice requirement of section 2-607 is satisfied only where the manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 494 (1996). A buyer may revoke acceptance of a "lot or commercial unit whose non-conformity substantially impairs its value to [the buyer]" "within a reasonable time after the buyer discovers or should

21

have discovered the ground for it." 810 ILCS 5/2-608(1)–(2). The revocation "is not effective until the buyer notifies the seller of it." 810 ILCS 5/2-608(2).

Xentris does not cite to any goods in any specific purchase order that it rejected, accepted but later revoked, or accepted and then informed Lucent of a breach and revocation. It does not point to evidence that it notified Lucent of trouble with a particular product—not just the product line—other than cosmetic issues in two units from purchase orders 45502 and 45805. It does not show how those two products, which were tested as part of Xentris and Lucent's course of conduct, caused Xentris to reject a shipment or revoke acceptance of any lots sent in. Xentris has also not shown how the cosmetic issues with those two products constituted a material breach of purchase orders 45502 and 45805 or the supply agreement; it has not shown that the non-conformity of the goods "substantially impair[ed] [their] value" to Xentris. 810 ILCS 5/2-608(1). Finally, Xentris has identified no quality issues in products from purchase orders 475464, 45667, 45804, or for any other products in purchase orders 45502 or 45805 beyond the ones mentioned in the October 2022 email. [61-4].

Xentris is not entitled to judgment as a matter of law on its counterclaim. Because there are still disputes of material fact regarding whether Lucent breached the contract in sending goods with quality issues, or whether it breached the contract by failing to meet delivery dates, Xentris's motion for summary judgment is denied.

22

## IV.    Conclusion

Lucent's motion for summary judgment, [46], is granted in part and denied in part. Xentris's motion for partial summary judgment, [49], [50], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: March 19, 2025